ROSEMARY LEDET, Judge.
| ,This is a Louisiana State Racing Commission (“LSRC”) case involving a five-year suspension of h jockey’s license for violating a Rule of Racing by refusing to submit to a urine sample when ordered, a violation LAC 35:1.1791.[1] The jockey, Trevino Clark, appeals from the district court’s judgment dismissing his petition for judicial review of the LSRC’s decision. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On February 15, 2011, the racing stewards of Louisiana Downs Racetrack in Bossier City, Louisiana, randomly selected Mr. Clark to submit to a drug screening by proving a urine sample. On that same date, Mr. Clark, in the presence of the LSRC’s specimen collector, Kurt Hannest-ed, provided a sample. The sample was ^shipped to Alere Toxicology Services, Inc., in Gretna, Louisiana, for testing. Al-ere provided the test results for review to Secón Drug Screening Company, the LSRC’s human drug testing laboratory. On February 18, 2011, Secón notified the LSRC that the sample was under medical review and that the donor should contact the medical officer. Two days later, Mr. Clark was notified.
On February 21, 2011, Secon’s Medical Review Officer, Dr. Brian Heinen, reported the sample as “SUBSTITUTED— CREATININE <1.0 MG/DL — SPECIFIC GRAVITY = 1.0003.” On that same date, Mr. Clark was notified that the sample provided was reported as a “substituted” sample — a finding by the testing laboratory that the sample was inconsistent with human urine. Mr. Clark was also notified of his right to invoke the split sample procedure.[2] Mr. Clark opted to exercise his right.
*823 ^Pursuant to the split sample procedure, on February 28, 2011, the split portion of the original sample was packaged in Mr. Clark’s presence and shipped to Clinical Reference Laboratory in Lenexa, Kansas for testing. On March 2, 2011, Clinical Reference Laboratory confirmed the initial results, finding: “SPECIMEN SUBSTITUTED: NOT CONSISTENT WITH NORMAL HUMAN URINE. SUB: SUBSTITUTED CREATININE < 1 MG/DL SPECIFIC GRAVITY 1.0003.” On March 5, 2011, Mr. Clark was notified that the split sample result confirmed the original result and that a stewards’ hearing would be held on March 8, 2011. He was informed of his right to have an attorney present and to bring with him any documentary evidence or witnesses.
On March 8, 2011, following the stewards hearing, the stewards issued Louisiana Downs Stewards’ Ruling No. 18558 (the “2011 LD Stewards’ Ruling”), which ordered:
Jockey TREVINO CLARK is hereby suspended six months 03/09/2011 through 09/08/2011 and his case is referred to the Louisiana State Racing Commission for whatever further action they deem necessary for failure to submit a valid urine sample when ordered by the Louisiana Downs Stewards. The sample was reported as a substitution and the split sample was confirmed as a substitution (third or more violations).
The ruling expressly indicated that it was “IN ACCORDANCE WITH LAC OR LRS 35:1.1791 TESTING FOR DANGEROUS SUBSTANCE ABUSE.”[3] Mr. 14 Clark was informed of his right to appeal the ruling to the LSRC, which he exercised.
In his appeal, Mr. Clark asserted that he was innocent of the charged violation for two reasons: (i) the LSRC specimen collector viewed the taking of his urine sample; and (ii) on March 8, 2011, he submitted, at the stewards’ suggestion, for *824 another drug test, and the result of that test was negative.[4]
On March 24, 2011, the LSRC sent Mr. Clark, by both certified and ordinary mail, a subpoena and a “Notice of Hearing of Referral & Appeal.” The subpoena commanded him to appear before the LSRC on April 18, 2011, to testify regarding the 2011 LD Stewards’ Ruling. The notice informed him of the hearing on that same date before the LSRC on both the stewards’ referral and his appeal from that ruling, which was noted to be in accordance with LAC 35:1.1791. The notice further informed him of his right to his own attorney to represent him before the LSRC, to present evidence on his own behalf, and to subpoena witnesses. The notice instructed that if he wished to subpoena any witnesses, he must submit a written request and that “[flailure to make such requests timely shall relieve the Commission of any responsibilities.” Finally, the notice indicated he had a right to receive a copy of the materials furnished to the member Racing Commissioners regarding his case, including: “(1) a summary of the case prepared by the attorney for the Racing Commission; (2) a Racing Commissioners International (RCI) license history of applicant; (3) any documents and/or correspondence to or from the Commission and/or the applicant regarding the pending request.”
IfiAt the April 18, 2011 hearing, Mr. Clark was not represented by an attorney and did not request that the LSRC subpoena any witnesses on his behalf. The only two witnesses that were sworn and testified at the hearing were Mr. Clark and Secon’s president, Chuck Dugas. Deviating from normal trial procedure, the LSRC’s attorney shifted the line of questioning between the two witnesses. At the start of the hearing, the LSRC’s attorney questioned Mr. Clark whether he contested “the fact that the pee collected was the pee tested;” Mr. Clark answered: “No. It was my pee, yes.” Given Mr. Clark’s stipulation that the sample he provided was the sample tested, the LSRC did not call any witnesses to establish the chain of custody of the sample; instead, it introduced documentary evidence — including the ALERE Chain of Custody Form and the Secón Drug Test Reports — and called an expert witness, Mr. Dugas, to explain the test results.
Mr. Dugas testified that, in his capacity as Secon’s president, he received a sample that was subsequently identified as belonging to Mr. Clark. Mr. Dugas testified that the sample showed a low creatinine level of below one milligram per deciliter. He explained that a normal creatinine level in human urine is between 20 to 300 milligrams per deciliter. He further explained that a creatinine level below one milligram is inconsistent with a human fluid and is essentially water.
Mr. Clark did not dispute the Secón test results; instead, he attempted to justify the results on the basis that he was taking prescription medication for high blood pressure that caused his creatinine level to be low. In support, he introduced into evidence a letter from his physician, Dr. Fred Willis, dated March 8, 2011. Dr. Willis’ letter, entitled “certificate to return to work/school,” stated that the patient has hypertension; is taking medication that is a diuretic, specifically, Lasix; and it “[m]ay cause low creatinine or a low specific gravity.” Mr. Clark neither | (¡requested that the LSRC subpoena Dr. *825 Willis to appear at the hearing, nor secured Dr. Willis’ presence.
Mr. Clark testified in his own defense that he has been taking high blood pressure medication since about 2000. The LSRC’s attorney then questioned Mr. Clark about his prior drug test results. He replied that at least one of his prior test results showed a low creatinine level.
The LSRC’s attorney then questioned Mr. Dugas whether the fact Mr. Clark was taking Lasix and Bystolic would produce a low creatinine and low specific gravity consistent with Mr. Clark’s test results. Answering in the negative, Mr. Dugas explained that taking such medications would produce a specimen that showed low crea-tinine, but “[t]his is extremely low.... [I]t doesn’t get that low, even if you are taking some other drugs.” In response to the question of what would be a low creati-nine level for a person who was taking a diuretic, Mr. Dugas replied “[y]ou would probably still be in the range of 20.” He testified that the lowest number he had ever seen was 18 or 19. He further testified: “I have never seen any urine in all the years that I have done this that shows up less than 1. That is almost no creati-nine and that tells me there is no human urine actually in the specimen.” He still further testified that this sample, which is less than one, “doesn’t qualify as a specimen coming out of — any type of human fluid.”
Near the close of Mr. Dugas’ testimony, the LSRC’s attorney asked Mr. Clark if he had any questions for Mr. Dugas. Mr. Clark declined to ask any questions; instead, he replied with further testimony, stating:
Yes. I mean it is human fluid because the chemist, she watched me urinate. She watches you. She is right there while you are urinating in a cup. I mean you can’t say it ain’t my urine, it is my urine, it came from my body.
|7I mean it is just like if you take Ex-lax and you go drink a soda, it will rush right through you, you know, before it even turns into stool. So I mean it’s the same thing with Lasix and water. As soon as you drink a glass of water, it is going to come right through you within not even 10,15 seconds.
The LSRC chairman then asked Mr. Du-gas whether, in his “professional opinion, this was not a human sample.” Answering in the affirmative, Mr. Dugas testified:
It does not appear to be a human sample and that was confirmed by two laboratories.
I mean I see this frequently. I’ve seen witness specimens where they come up as water as well because what you see isn’t always what you see. I have seen all of this and people are quite creative. I have to go back to the laboratory analysis. We had one lab that came up with this result, it was subsequently sent to a second lab that delivered the same results as the first lab.
When I have got two labs telling me that there is no component of human urine in it and that the specific gravity is low, creatinine is low, the color is clear, that appears to be water to me for the most part.
The LSRC chairman then questioned Mr. Clark about his prior violations. Mr. Clark acknowledged that he had three pri- or violations of LAC 85:1.1791 — two prior positive test results and one prior refusal. These prior violations were established by Mr. Clark’s RCI license history as well as three prior steward rulings, copies of which were introduced. The details of Mr. Clark’s three prior violations were as follows:
• 6/4/04 — Ruling No. 13513, Delta Downs: Second offense violation for *826 testing positive for cocaine on 5/7/04, confirmed in split; suspended six months. His reinstatement was contingent upon proof of enrollment and continued attendance in a LSRC approved drug rehabilitation program and after providing a negative urine report. Appeal granted then withdrawn by subject. Reinstated 5/6/05.
• 7/5/98 — Ruling No. 8246, Delta Downs: Failure or refusal to submit to a specimen as ordered by the stewards on 5/17/98. Suspended six months. Reinstated 1/6/99.
| R* 5/9/97 — Ruling No. 7112, Evangeline Downs: Tested positive for Cocaine on 4/26/97. Confirmed in split. Suspended 30 days. His reinstatement was contingent upon an evaluation by a commission approved drug evaluator and after providing a negative urine report. , Upheld on appeal. Reinstated 8/15/97.
Following the hearing, the LSRC upheld the stewards’ ruling and increased the penalty imposed on Mr. Clark to a five-year suspension, effective April 18, 2011 through April 17, 2016. Mr. Clark was denied access to all race tracks, off-track wagering facilities, and recognized training tracks under the LSRC’s jurisdiction.
On April 21, 2011, Mr. Clark filed in the district court a Petition for Temporary Restraining Order and/or Preliminary Injunction and Damages against the LSRC. The LSRC filed an opposition and an answer. Following a hearing, the district court granted the preliminary injunction, granted the LSRC’s exception of no cause of action, and allowed Mr. Clark to amend his petition. Mr. Clark filed an amended and supplemental petition for judicial review of Administrative Decision (an appeal), which the LSRC answered.
The district court, following a hearing, affirmed the LSRC’s decision imposing a five year suspension. In its reasons for judgment, the district court found the LSRC’s actions were reasonable, stating:
Mr. Clark stipulated that the specimen tested was the specimen that he submitted to the specimen collector. Mr. Clark never challenged the chain of custody and actually stipulated to it during the hearing....
He did not deny that the specimen was his. He did not contest the findings of the laboratory. Instead, Mr. Clark offered evidence that his ingestion of the diuretic Lassix caused his specimen to report as inconsistent with human urine. The Commission also took note of Mr. Clark’s history of failing to provide specimens when ordered and/or testing positive for controlled substances.
|flThe Commission offered testimony through Mr. Chad Dugas of Secón Laboratory. Mr. Dugas testified that in his professional opinion the urine submitted was not a human sample.... The Commission found Mr. Dugas’ testimony to be credible and Mr. Clark’s explanation medically unsound. This Court agrees. This appeal followed.[5]
STANDARD OF REVIEW
A party aggrieved by a final agency decision in an adjudication proceeding is entitled to have that decision reviewed initially by the district court of the parish in which the agency is located. La. R.S. 49:964(A)(1) and (B). The district court acts in the capacity of an intermediate appellate court. A party aggrieved by the district court’s decision is entitled to appeal to the appropriate appellate court as in other civil cases. La. R.S. 49:965. *827 When an appellate court reviews the district court’s judgment, no deference is owed by the appellate court to the district court’s fact findings or legal conclusions, “‘just as no deference is' owed by the Louisiana Supreme Court to factual findings or legal conclusions of the court of appeal. Thus, an appellate court sitting in review of an administrative agency reviews the findings and decision of the administrative agency and not the decision of the district court.’ ” Bourgeois v. Louisiana State Racing Comm’n, 10-0573, p. 7 (La. App. 4 Cir. 11/12/10), 51 So.3d 851, 856 (quoting Smith v. State, Dep’t of Health and Hospitals, 39,368, pp. 4-5 (La.App.2d Cir.03/02/05), 895 So.2d 735, 739).
The standard of appellate review of an administrative agency’s decision is distinct from and narrower than that which applies to ordinary civil and criminal appeals. Reaux v. Louisiana Bd. of Med. Examiners, 02-0906, p. 3 (La.App. 4 Cir. 5/21/03), 850 So.2d 723, 726. The exclusive grounds upon which an | ^administrative agency’s decision may be reversed or modified on appeal are enumerated in La. R.S. 49:964(G) of the Administrative Procedure Act (“APA”). Armstrong v. Louisiana State Bd. of Medical Examiners, 03-1241, pp. 9-11 (La.App. 4 Cir. 2/18/04), 868 So.2d 830, 837-38.
Defining the scope and standards for judicial review of agency decisions, La. R.S. 49:964(G) provides that a court can reverse an agency’s decision if the appellant’s substantial rights have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court. In the application of this rule, the court shall make its own evaluation of the record reviewed in its entirety upon judicial review. In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency’s determination of credibility issues.
La. R.S. 49:964 G. The APA further provides that “[t]he agency’s experience, technical competence, and specialized knowledge may be utilized in the evaluation of the evidence.” La. R.S. 49:956(3).
[4,5] A reviewing court should not set aside an administrative agency’s decision to impose a particular sanction unless that decision can be characterized as arbitrary, capricious, or an abuse of discretion. Holladay v. Louisiana State Bd. of Med. Examiners, 96-1740, p. 18 (La.App. 4 Cir. 2/19/97), 689 So.2d 718, 727 (citing La. R.S. 49:956(5)). An agency’s action is presumed to be legitimate and correct; and the burden is on the appellant, here Mr. Clark, to demonstrate grounds for reversal or modification. Reaux, 02-0906 at p. 2, 850 So.2d at 726 (citing Holladay, supra).
DISCUSSION
Mr. Clark raises two constitutional due process issues on appeal: (i) improper notice and (ii) violation of the right to confront witnesses and examine evidence.[6] We separately address each issue.
*828 (i)improper notice
The APA, which applies in this case, dictates that the notice of hearing contain the following:
(1) A statement of the time, place, and nature of the hearing;
(2) A statement of the legal authority and jurisdiction under which the hearing is to be held;
(3) A reference to the particular sections of the statutes and rules involved;
(4) A short and plain statement of the matters asserted.
If the agency or other party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved. Thereafter, upon application, a more definite and detailed statement shall be furnished.
La. R.S. 49:955(B).
Mr. Clark’s argues that the standard form notice the LSRC sent to him of the hearing failed to comply with due process. The defect in the notice, according to Mr. Clark, was not that it failed to comply with La. R.S. 49:955(B), but rather that it failed to inform him that the LSRC would be seeking to use his prior diseiplin-ary | ^violations to enhance any penalty that he might receive for this alleged violation. He argues that he had a constitutional right to know in advance that the LSRC was seeking an enhanced penalty based upon his prior disciplinary violations. Although he acknowledges that this is not a criminal case, Mr. Clark argues that he was entitled to the same type of protection, including notice and proof,[7] as accorded a criminal defendant sought to be declared a multiple offender.
Rejecting Mr. Clark’s improper notice argument, the district court cited the governing provision, LAC 35:1.1791, which it noted “specifically sets forth penalties for first, second, and third violations.”[8] The *829 district court also noted that 11sthe subpoena and notice that the LSRC sent Mr. Clark informed him that he had the right to receive all the information that was furnished to the Commissioners regarding his case, including his RCI license history. As noted earlier, Mr. Clark’s RCI license history documented three prior violations of LAC 35:1.1791 — two prior positive test results and one prior refusal. Given these facts, the district court concluded that “[t]his provided Mr. Clark with notice that prior violations would be used in determining sanctions.” We agree.
Mr. Clark’s reliance on Benoit v. Louisiana State Racing Comm’n, 576 So.2d 578 (La.App. 4th Cir.1991), in support of his contention that he did not receive proper notice is misplaced. In Benoit, supra, the LSRC acknowledged on appeal that the notice was defective because the specified violation cited in the notice was incorrect. Such is not the case here. The standard notice that the LSRC sent to Mr. Clark cross-referenced the 2011 LD Stewards’ Ruling, which spelled out the violation correctly as a “failure to submit a valid urine sample when ordered by the Louisiana Downs Stewards.” The 2011 LD Stewards’ Ruling also spelled out that the “sample was reported as a substitution and the split sample was confirmed as a substitution (third or more violations).” As the LSRC points out, the notice informed Mr. Clark that the rule at issue was LAC 35:1.1791, which provides for tiered penalties for “third offenses of positive and/or substituted urine samples.”
The cross-reference in the notice to the 2011 LD Stewards’ Ruling was sufficient to comply with due process. See Durham v. Louisiana State Racing Comm’n, 439 So.2d 1191 (La.App. 4th Cir.1983). In Durham, supra, this court rejected a jockey’s argument of improper notice given that the notice advised that |14it was in regard to an attached stewards’ ruling. Finding the referenced notice satisfied due process requirements, this court reasoned that the stewards’ ruling described the plaintiffs actions that were the subject of the ruling, summarized the evidence against the plaintiff, and referred to the rule outlining prohibited drugs. In addition, this court cited two other factors in support of its finding of proper notice: “(1) that plaintiff never requested a more definite statement from the Commission as provided by La. R.S. 49:955, and (2) the hearing was requested by the plaintiff himself.” Durham, 439 So.2d at 1193.
*830 In this case, the standard notice cross-referenced the 2011 LD Stewards’ Ruling and the two additional factors cited in Durham, supra, were present. First, Mr. Clark never requested a more definite statement from the LSRC. Second, the hearing was compelled not only by the LSRC, but also by Mr. Clark’s own appeal from the 2011 LD Stewards’ Ruling. We thus find Mr. Clark’s argument that the notice was improper unpersuasive.
(ii) violation of the right to confront witnesses and examine evidence
Mr. Clark’s next argument is that the LSRC violated his due process rights by not allowing him to confront witnesses and examine evidence. Particularly, he contends that he was not allowed to have the LSRC specimen collector who observed the taking of the sample, Mr. Han-nested, testify as to his compliance with the request to submit a sample. According to Mr. Clark, the LSRC denied his request to have Mr. Hannested testify. He further contends that there were flaws in the chain of custody of the sample. He still further contends that the LSRC’s sole witness, Mr. Dugas, was not properly qualified as an expert in any field; that since Mr. Dugas was not qualified, Mr. Dugas should not have been allowed to testify; and that he was not allowed to cross examine Mr. Dugas. Finally, he contends that _j^he was not allowed to present mitigating evidence; particularly, he contends that he was not allowed to formally introduce the independent urinalysis that he obtained at his own expense, which was a clean urine screen.
Mr. Clark’s factual allegations that he was denied the right to call witnesses, challenge the chain of custody, cross examine the LSRC’s witness, or present evidence are belied by the record. Mr. Clark was notified before the LSRC hearing of his right to be represented by counsel and to subpoena witnesses, yet he failed to exercise either right. At the beginning of the hearing, Mr. Clark was given the opportunity to dispute or to stipulate to the chain of custody. He stipulated to the chain of custody. Particularly, he acknowledged that the specimen tested was the specimen that he provided to the specimen collector. Indeed, multiple times during the hearing he acknowledged that the sample tested was the sample he provided; his testimony was as follows:
• At the outset of the proceeding, the LSRC’s attorney asked Mr. Clark whether he contested the fact that the pee collected was the pee tested. He responded: “No. It was my pee, yes.”
• In response to Mr. Dugas’ testimony, Mr. Clark stated that “you can’t say it ain’t my urine, it is my urine, it came from my body.”
• In response to the Commissioner’s questions regarding prior violations, Mr. Clark testified that the instant violation “isn’t a refusal because I urinated. They watched me.”
• Near the end of the hearing, Mr. Clark testified that “there is no way you can say it didn’t come from my body especially when I got my letter from my doctor where it says the crea-tinine be low.”
• At the end of the hearing, he testified: “I got papers here showing that I was seen giving the urine sample. So you can’t say I didn’t give the urine sample, that it didn’t come from me.”
On appeal, Mr. Clark seeks to dispute the chain of custody stipulation. He argues that what he said was that “he submitted a urine sample in the presence of 11Bthe collector and that it was untrue that the urine sample did not come from him.” His own argument belies his contention that he did not stipulate to the chain of *831 custody. Thus, there was a valid stipulation.
Based on the stipulation, the LSRC did not present testimony regarding the chain of custody; rather, it called Mr. Du-gas as a witness to explain the meaning of the test results. Although the LSRC did not put Mr. Dugas’ qualifications on the record, he testified that he was Secon’s president. He also mentioned in his testimony that he had years of experience; as quoted earlier, his testimony was that “I have never seen any urine in all the years that I have done this that shows up less than 1.” At no time during the hearing did Mr. Clark challenge Mr. Dugas’ qualifications. Moreover, “[a]dministrative bodies are usually not bound by the technical rules of evidence.” Louisiana Household Goods Carriers v. Louisiana Public Service Comm’n, 99-3184, p. 9 (La.6/30/00), 762 So.2d 1081, 1089 (citing Chaisson v. Cajun Bag & Supply Co., 97-1225 (La.3/4/98), 708 So.2d 375).
Contrary to Mr. Clark’s contention, he was offered the opportunity to cross examine Mr. Dugas. The LSRC’s attorney questioned Mr. Clark on the record if he had any questions for Mr. Dugas; Mr. Clark opted not to ask him any questions. Mr. Clark also exercised his right to present evidence; he presented not only his own testimony, but also a letter from his physician, Dr. Willis. Although he was not allowed to formally introduce his clean urine screen, Mr. Clark acknowledged that the test result reflecting that clean urine screen was included in the record before LSRC. For these reasons, the record does not support Mr. Clark’s factual contention that the LSRC failed to afford him due process at the hearing.
Mr. Clark additionally argues that the evidence presented against him to establish a violation was entirely hearsay— “only accusations and dubious lab 117reports” — and thus was legally insufficient. In support, he cites Hall v. Louisiana State Racing Comm’n, 505 So.2d 744 (La.App. 4th Cir.1987), and quotes from Bourque v. Louisiana State Racing Comm’n, 611 So.2d 742 (LaApp. 4th Cir. 1992).
This court in Hall and subsequent cases, including Bourque, supra, has consistently held that due process is violated by “a Louisiana Racing Commission ruling ‘based entirely on documentary hearsay evidence, the basis for which the adverse party is not able to inquire into.’ ” Miller v. Louisiana State Racing Comm’n, 508 So.2d 585, 586 (La.App. 4th Cir.1987) (Ward, J., concurring). “[A]dministrative findings must be set aside if supported only by hearsay evidence since the defendant is not afforded a fair opportunity to rebut or cross-examine, the offending documents.” Bourque, 611 So.2d at 743.
The rule adopted in Hall, supra, and followed in subsequent cases, is referred to as the “residuum rule.” See Ernest H. Schopler, Annotation, “Hearsay Evidence in Proceedings Before State Administrative Agencies,” 36 AL.R.3d 12, § 6 (1971) (citing Hall, supra). As former Justice (then Judge) Lemmon explained in Rothbard v. Gerace, 354 So.2d 225 (La. App. 4th Cir.1978), the residuüm rule is that “hearsay evidence, at least when not objected to, may be used in administrative proceedings for limited purposes such as corroboration, but that such evidence cannot form the sole basis of the decision.” Rothbard, 354 So.2d at 226. Under this rule, “a court determining sufficiency of evidence (which is a question of law) must find some competent evidence to support an administrative decision and cannot affirm the decision solely on hearsay evidence.” Id.
*832 In Hall, supra, this court found the residuum rule violated because the sole evidence against Mr. Hall was documentary, hearsay. Mr. Clark contends that the | jsfacts of this case are “very similar” to those in Hall, supra. We disagree. Rather, the facts in this case are much closer to those in Rothbard, supra.
In Rothbard, an employment compensation case, the issue was whether an employee was terminated for misconduct and thus barred from seeking benefits. At the administrative hearing, the employee appeared in proper person; the employer, who failed to make an appearance, submitted only hearsay evidence — affidavits. Considering the affidavits, the appeals referee found in the employer’s favor. Functioning as an intermediate appellate court, the district court reversed. On appeal, this court framed the threshold issue as “the effect of the hearsay evidence.” Rothbard, 354 So.2d at 226. Because the employee himself testified, admitted the behavior detailed in the affidavits, and attempted to justify his behavior, this court found it unnecessary to reach the issue of whether the residuum rule applied. Instead, this court reasoned that “the eviden-tiary value of the affidavits [the hearsay evidence] is not a problem in this appeal, which turns on plaintiffs own testimony attempting to justify his behavior.” Id. Continuing, this court found that “plaintiffs explanation of his behavior was implicitly rejected by the appeals referee as not reasonably justified under the circumstances.” Rothbard, 354 So.2d at 227. This court thus found the district court erred in substituting its judgment for the reasonable determination of the appeals referee.
This case, as in Rothbard, supra, turns not on the documentary, hearsay evidence presented by the LSRC in its case in chief, but on Mr. Clark’s testimony in support of his affirmative defense of justification. Thus, in this case, as in Rothbard, supra, we need not decide whether the residuum rule applies. Mr. Clark, like Mr. Roth-bard, appeared in proper person at the LSRC hearing and testified on his own behalf. As noted, Mr. Clark stipulated that the urine sample that was tested 119was the sample he provided.[9] Given Mr. Clark’s stipulation, the LSRC was relieved of establishing a proper chain of custody. The disputed issue was narrowed to whether the specimen was a substituted sample. Mr. Clark did not dispute the test results; rather, he presented evidence attempting to justify his low creatinine level. This case thus turned on the justification defense.
On the justification defense, the burden of proof was on Mr. Clark. Mr. Clark offered, and was allowed to introduce, a letter from his physician, Dr. Willis. Although Mr. Clark’s physician’s letter was allowed into evidence, the letter was incompetent evidence due to Mr. Clark’s failure to provide any foundational testimony. See George v. Department of Fire, 93-2421 (La.App. 4 Cir. 5/17/94), 637 So.2d 1097, 1107, n. 7 (rejecting argument that hearing officer committed reversible error in failing to admit plaintiffs dentist’s letter stating that plaintiff was taking prescription medication containing codeine that should have showed up in his test results on the basis that the letter was “incompetent evidence due to George’s failure to produce foundational testimony.”) Regardless, Dr. Willis’ letter failed to address the pivotal issue of whether a creatinine level of less than one is consistent with the test results of a substituted sample — not human urine. The LSRC’s witness, Mr. Dugas, testified *833 on this issue that, in his professional opinion, the test results were not consistent with human urine — established a substituted sample.
As noted, the LSRC found Mr. Clark’s testimony regarding the justification defense medically unsound and found Mr. Dugas’ testimony regarding the substituted sample to be credible. We cannot conclude that the LSRC’s finding of a ^^substituted sample violation was unreasonable. Nor can we conclude that Mr. Clark was deprived of his due process right to confront witnesses and examine evidence.

DECREE

For the foregoing reasons, the judgment of the district court is affirmed.
AFFIRMED

. LAC 35:I.1791(B) provides:
B. Every person licensed by the commission at any licensed racetrack may be subjected to a urine test, or other noninvasive fluid test at the discretion of the state steward in a manner prescribed by the commission. Any licensed person who fails to submit to a urine test when requested to do so by the state steward shall be liable to the penalties provided herein. Failure or refusal to submit to a urine test when ordered by the state steward shall result in a minimum 90-day suspension. Failure or refusal to submit to a urine test for a second time shall result in a suspension by the stewards to the full extent of their power and referral to the Commission-
Pursuant to LAC 35:I.1791(B), a substituted sample is deemed a refusal to provide a sample.

. Although technically the split sample procedure is designed for use when the jockey tests positive for drugs, in this case the procedure was used to confirm the existence of a substituted sample. The split sample procedure is defined in LAC 35:1.1791 as follows:
D. A positive controlled dangerous substance or prescription drug result shall be reported in writing to the commission or its designee. On receiving written notice from the official chemist that a specimen has been found positive for a controlled danger *823 ous substance or prescription legend drug, the commission or its designee shall proceed as follows.
1. The licensed person shall, as quickly as possible, be notified in writing and a hearing scheduled with the stewards.
a. If a person having tested positive for a dangerous substance or prescription drug so desires, he/she may request within five days to the stewards to have the split or referee sample tested by a commission-designated alternate laboratory as provided herein. At the time of the request, the licensed person must deposit with the stewards an amount equivalent to the fee charged by the referee laboratory chosen to cover expenses to be incurred in testing the split sample. Failure of a licensed person to make a request within five days constitutes a waiver of any and all rights to have the split sample tested.
b. Split samples shall be stored in a locked freezer pending the laboratory results of the original samples. If an original sample’s result is negative, the split sample may be disposed*of. However, if the result is positive, the split sample shall be retained in the locked freezer until needed or until final disposition of the case,
c.A licensed person's timely request for the testing of the split sample may then select any one of the commission-designated alternate laboratories to perform the testing.

. The steward’s authority is limited to a six month suspension and a referral to the commission. La. R.S. 4:172(M) provides:
The stewards may suspend for no greater period than the duration of the meeting plus ten days or for a period not to exceed six months, whichever is greater, or they may impose a fine not to exceed one thousand dollars. All such suspensions and fines must be reported to the commission. If the greater period of suspension and the fine herein authorized is not in the opinion of the stewards sufficient, they shall refer the matter to the commission for its determination de novo.

. Based on his negative test result, the LSRC granted Mr. Clark's request for a suspensive appeal.

. Although Mr. Clark filed a suspensive appeal, the district court on April 5, 2012, granted the LSRC's Motion to Convert Suspensive Appeal to Devolutive Appeal.

. Mr. Clark’s assignments of error on appeal are as follows: (i) that he was not afforded *828 due process in the LSRC's hearing process, and (ii) that the LSRC violated his right to confront witnesses and examine evidence.

. As to proof, Mr. Clark contends that the LSRC failed to introduce proper evidence establishing his prior disciplinary violations. Contrary to Mr. Clark’s contention, the LSRC was entitled to take judicial notice of the prior violations of LAC 35:1.1791 established by both his RCI licensing history and three prior steward rulings, copies of which were introduced at the hearing.

. Both the district court and the LSRC referenced the tiered penalties in LAC 35:I.1791(D), which pertains directly to positive drug test results; this subsection provides:
D. A positive controlled dangerous substance or prescription drug result shall be reported in writing to the commission or its designee. On receiving written notice from the official chemist that a specimen has been found positive for a controlled dangerous substance or prescription legend drug, the commission or its designee shall proceed as follows.
1. The licensed person shall, as quickly as possible, be notified in writing and a hearing scheduled with the stewards....
2. For a licensed person's first violation, he shall be suspended 30 days and denied access to all racetracks, off-track wagering facilities and approved training facilities in Louisiana. His reinstatement shall be contingent upon evaluation by a commission approved board certified drug evaluator or counselor, and after providing a negative urine report.
3. For a licensed person’s second violation, he shall be suspended six months and denied access to all racetracks, off-track wagering facilities and approved training facilities in Louisiana. His reinstatement may be allowed upon proof of enrollment, and continued attendance in a commission approved drug rehabilitation program.
4. For a licensed person’s third violation, he shall be suspended up to a maximum of 15 years and denied access to all racetracks, off-track wagering facilities and approved training facilities in Louisiana. His/ her reinstatement may be allowed upon proof of enrollment and continued attend- *829 anee in a commission approved drug rehabilitation program with a minimum of one year stay in a halfway house, at which he/ she must attain the highest level of Recovery Dynamics, Step 12 of an AA/NA program, and otherwise submit proof he/she is currently and has been drug-free. In addition, he/she must sign a consent agreement with stipulations as determined by the commission.
This case, however, involves a second violation of the rule for refusing to submit to a urine sample. The governing penalty provision is in LAC 35:I.1791(B), which likewise provides for tiered penalties as follows: "[failure or refusal to submit to a urine test when ordered by the state steward shall result in a minimum 90-day suspension. Failure or refusal to submit to a urine test for a second time shall result in a suspension by the stewards to the full extent of their power [six months] and referral to the commission.” The LSRC’s power to suspend a licensee is governed by La. R.S. 4:155, which provides that the LSRC "may impose upon the licensee a fine not exceeding ten thousand dollars and may suspend a licensee indefinitely or both.” The penalties available under LAC 35:1.1791(B) thus are more onerous than those available under LAC 35:I.1791(D). Regardless, in imposing a penalty for a second refusal violation of LAC 35:I.1791(B), the LSRC could consider the penalties provided for in LAC 35:I.1791(D) for multiple violations.

. The residuum rule does not prevent parties from stipulating to factual findings. Gehin v. Wisconsin Group Ins. Bd., 278 Wis.2d 111, 156, 692 N.W.2d 572, 594 (2005).