Judge Rosemary Ledet
| t This is a property tax assessment case. The three parties to this appeal are as follows: (i) Erroll Williams, in his capacity as the Assessor for the Parish of Orleans, State of Louisiana (the “Assessor”); (ii) The Muses, Ltd. 1; and The Muses II, LP (collectively “The Muses” or the “Taxpayers”), two limited partnerships that each own one phase of an affordable housing apartment complex located in the Parish of Orleans known as “The Muses Apart *560 ments” (the “Complex”); and (iii) the Louisiana Tax Commission (“LTC”).
This case arose as a result of the Assessor’s placement of the Complex — three separate tax parcels[1] — on its tax rolls for both 2014 and 2015 at an assessment value that The Muses challenged as excessive. Agreeing with The Muses, the LTC, in four separate decisions, ruled that the federal Low-Income Housing Tax Credit (“LIHTC”) — a tax credit pursuant to Internal Revenue Code § 42 designed as an incentive to promote the construction of affordable housing — ] ^received by The Muses’ owners was not income and that the Assessor could not include the LIHTC when assessing the value of such affordable housing using the income approach. The Assessor appealed those four decisions to the trial court, as the first court of appellate review.[2] From the trial court’s decision granting The Muses’ exception of prescription as to two of the four decisions and affirming the LTC’s decisions in the other two appeals, the Assessor appeals to this court.
Reduced to its essence, this appeal presents the following two issues: (i) whether two of the four appeals were correctly dismissed as prescribed on the basis that the Assessor’s appeals were untimely filed; and (ii) whether the LTC erred in finding that the Assessor could not include the value of the LIHTC in determining the fair market value of the Complex for ad volorem taxes using the income approach. For the reasons that follow, we reverse the trial court’s finding that two of the appeals are prescribed, affirm the trial court’s finding that the LTC did not err in determining that the Assessor could not include the value of the LIHTC, and remand with instructions that the trial court reconsider its decisions in the two appeals it dismissed as prescribed in light of our decision in this case.
FACTUAL AND PROCEDURAL BACKGROUND
As the Assessor points out, the facts in this case are not in dispute. The Muses’ Complex is a four-story, mixed-income, affordable housing development [^located in the Central City neighborhood of New Orleans. The Complex, constructed in two phases between 2009 and 2011, was designed as an affordable housing development in order to qualify for the LIHTC program.[3] Phase I of the Complex consists of 211 apartment units; Phase II consists of 52 units. Combined, the Complex has 268 apartment units, 244,056 rentable square feet, and amenities.[4]
*561 Of the Complex’s 263 apartment units, 99 are subject to rental restrictions imposed in accordance with the LIHTC program. Also in accordance with the LIHTC program, 75% of the units in Phase I are leased to households earning less than 50% of the area median income of $63,000; and 23 of the units in Phase II are leased to those earning between 20% and 80% of the area mean income. The Louisiana Housing Corporation (“LHC”) — the agency that administers the LIHTC program in this state — categorizes the Complex as a “deep affordability project” because 10% of the housing units are dedicated to households earning less than 20% of the area median income, and an additional 10% are dedicated to those earning less than 30% of the area median income. Pursuant to the Land Use Restriction Agreement (“LURA”) that was entered into for each phase,[5] The Muses is required to maintain the allocation of affordable housing units until December 31, 2045 for Phase I, and December 31, 2040 for Phase II — the “Qualified Compliance Period” for each phase.
|4Pursuant to the LIHTC program, The Muses was awarded approximately $15.3 million in LIHTCs (approximately $1.53 million per year), which will be fully exhausted in 2020. At the outset of the development, The Muses sold the right to use those tax credits through syndication. As a result, The Muses generated approximately $10 million of equity that it, in turn, used to pay its construction loan.[6]
As noted above, the current dispute arose when the Assessor determined that The Muses were two for-profit entities and placed the three tax parcels comprising the Complex on thé assessment rolls for the tax years 2014 and 2015. In assessing the Complex — the total land and improvement value for Phases I and II — the Assessor assigned a fair market value to the property of $23,433,700 for both 2014 and 2015. In determining the fair market value of the Complex, the Assessor used |fithe income approach and included in the calculation the value of the LIHTC received annually by The Muses’ owners.
*562 The Muses appealed the assessments to the Orleans Parish Board of Review — the City Council of New Orleans. The Board of Review revised the 2014 fair market value and affirmed the 2015 fair market value. The Board of Review determined that the 2014 fair market value of the Complex was $19,028,000. The Muses appealed the Assessor’s 2014 and 2015 assessments to the LTC. The Assessor also appealed the revised 2014 assessments.
On December 2, 2014, the matter came before the LTC for a hearing on the dual appeal — an appeal by both the Assessor and the Taxpayers. For the 2014 tax year, the LTC heard appeals as to all three tax parcels that comprise the Complex; for the 2015 tax year, the LTC heard a fourth appeal as to one- of those same parcels. The issue presented to the LTC was the determination of the fair market value of the Complex — -which consists of the 263 apartment units, support facilities, and amenities — for ad valorem tax purposes.
At the hearing, the appraisers for all three parties — the Assessor, the Muses, and the LTC — were in agreement on the following two things: (i) the use of the income approach and (ii) the use of the restricted (as opposed to the actual market) rents. The fundamental disagreement among the parties’ appraisers was whether to include the value of the LIHTC as income.
The LTC’s in-house appraiser, Alicia La-bat, presented her appraisal reflecting a total fair market value for the Complex of $16,678,000. Ms. Labat testified that she chose not to include the value of the LIHTC for the following two treasons: “One,. I’m not an expert - in valuing tax credits. And so I. left that up to certain individuals. Two, it was information that was not made available to utilize within the appraisal if I were a certified expert.”
The Muses’ sole witness at' the LTC hearing was Kevin Hilbert, a consultant who had appraised the Complex, Mr. Hilbert testified that he understood “the difference in the [appraisal] values is the assessor’s office is including the pro rata, the annual pro rata tax credit amount and putting' it into the cash flow. That’s really thé difference between my value, the Board of Review’s value, and the LTC value. Roughly, that cash flow is a million dollars.”[7]
The Assessor presented two witnesses at the LTC. hearing — Thomas Sandoz, the Assessor’s office staff appraiser, who reassessed the Complex before the hearing; and Mike Truax, an independent appraiser who did not value the Complex but testified and provided a report on the methodologies employed by the Assessor in valuing the Complex. As Mr. Truax explained, his testimony was meant to provide some background as to the appraisal theory.[8] Mr. Sandoz’s appraisal report was introduced at the hearing; his report reflects that he derived his' net income figures from the appraisals done by Ms. Labat and Mr. Hilbert. Unlike the other appraisers, however, Mr. Sandoz included the value of the LIHTC in his calculations.[9] Although *563 Mr. Sandoz appraised the total fair market value of the |7Complex to be $27,163,731, the Assessor’s attorney explained at the LTC hearing that Mr. Sandoz’s calculation mistakenly included a - dual assessment. The revised valuation sought by the Assessor before the LTC thus was $23,433,700— the Assessor’s original assessment amount for both the 2014 and 2015 tax years.
Following the hearing, the LTC determined that for the 2014 tax year, for which it heard appeals as to all three tax parcels, the Complex had a combined fair market value of $16,678,000, the value proposed by its in-house appraiser, Ms. Labat. For the 2015 tax year, the LTC issued a ruling consistent with its ruling for the 2014 tax year. Thereafter, the LTC rendered four separate decisions — one for each of the three parcels comprising the Complex for the 2014 tax year and one for one of those parcels for the 2015 tax year.[10] From those decisions, the Assessor appealed to the trial court. In response, the Muses filed a peremptory exception of prescription as to two of those appeals.
On January 8, 2016, thé trial court rendered judgment granting the Muses’ peremptory exception of prescription as to two of the appeals and affirming the LTC’s decision in The Muses’ favor on the merits as to the other two appeals.[11] This appeal followed.
DISCUSSION
18Judicial review in tax assessment cases is governed by La. Const, art. VII, § 18 (E), which provides that “[t]he correctness of assessments by the assessor shall be subject to review first by -the parish governing authority [here, the Orleans Parish Board of-Review — the Orleans Parish City Council], then by the Louisiana Tax Commission or its successor [here, the LTC], and finally by the courts, [here, the trial court and then this court], all in accordance with procedures established by law.” Judicial review of the LTC’s decisions is governed by La. R.S. 47:1998 A(l)(a).[12]
Tax credit derived from Properties: $1,532,356
Net operating income $1,120:954
Total net income for the year $2,653,310
*564 When not otherwise specifically-provided by law, the LTC is governed by the Administrative Procedures Act (“APA”); hence, the extent and standards of judicial review of the LTC’s decisions are governed by La. R.S. 49:964 F and G of the APA. See Panacon v. Louisiana Tax Comm’n, 97-2093, p. 4 (La.App. 1 Cir. 1/8/99), 747 So.2d 572, 573-74 (citing Hotel de La Monnaie Owners Association, Inc. v. Louisiana Tax Comm’n, 95-1009, p. 5 (La.App. 1 Cir. 12/15/95), 669 So.2d 455, 458); EOP New Orleans, L.L.C. v. Louisiana Tax Comm’n, 01-2966, p. 4 (La.App. 1 Cir. 8/14/02), 831 So.2d 1005, 1007-08; Johnson v. La Belle Creole Associates, 00-0630, p. 2 (La.App. 4 Cir. 1/10/01), 779 So.2d 15, 16 (citing Panacon, supra).
InThis court summarized the standard of review under the APA in Davis v. State Bd. of Certified Pub. Accountants of Louisiana, 13-0514, pp. 5-7 (La.App. 4 Cir. 12/18/13), 131 So.3d 391, 395-96, as follows:
A reviewing court may reverse or modify an agency’s findings, inferences, conclusions, or decisions “if substantial rights of the appellant have been prejudiced” because the agency’s findings, inferences, conclusions, or decisions are “[n]ot supported and sustainable by a preponderance of evidence as determined by the reviewing court.” La. R.S. 49:964 G(6) (emphasis added). “In the application of this rule, the court shall make its own determination and conclusions of fact by a preponderance of the evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review.” Ibid, (emphasis added). But also, “[i]n the application of this rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of the demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency’s determination of credibility issues.” Ibid, (emphasis added). We also give deference to agency determinations of questions of law and mixed questions of law and fact which the agency has been charged to answer as well as the judgments of agencies upon the professional behavior of a member of the profession which the agency is charged to oversee.
A reviewing court may also reverse or modify an adjudication if the agency’s holding was “arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.” La. R.S. 49:964 G(5). A reviewing court should not intervene unless the administrative agencies’ conduct is clearly unreasonable and arbitrary. See Bourgeois v. Louisiana State Racing Comm’n, 10-0573, p. 6 (La.App. 4 Cir. 11/12/10), 51 So.3d 851, 856. This provision applies to our review of final questions of law and mixed questions of law and fact, which the Board has been charged to answer. See Carpenter v. State, Dept. of Health and Hospitals, 05-1904, p. 5 (La.App. 1 Cir. 9/20/06), 944 So.2d 604, 608. See, e.g., Clark v. Louisiana State Racing Comm’n, 12-1049, p. 10 (La.App. 4 Cir. 12/12/12), 104 So.3d 820, 827. This deference is granted to an administrative agency due to its heightened expertise in the matters that the agency reviews.
Finally, a reviewing court may reverse or modify the agency’s findings, inferences, conclusions, or decisions “if substantial rights of the appellant have been prejudiced” because the agency’s find *565 ings, inferences, conclusions, or decisions are (1) in violation of constitutional or statutory provisions, (2) in excess of the statutory authority of the agency, (3) made upon unlawful procedure, or (4) affected by other error of law. See .La. R.S. 49:964 G(l)-(4). These grounds present questions of law, and are reviewed de novo — without |inany deference to the agency or the district court as the first court of review. See Carpenter, 05-1904 at p. 5, 944 So.2d at 608.
Id. (internal footnote omitted). “Appellate review of a question of law involves a determination of whether the lower court’s interpretive decision is legally correct.” Williams v. Hotel Ambassador NOLA, LLC, 16-0015, p. 4 (La.App. 4 Cir. 6/15/16), 195 So.3d 1225, 1227 (citing Johnson v. Louisiana Tax Comm’n, 01-0964, p. 2 (La. App. 4 Cir. 1/16/02), 807 So.2d 329, 331).
“An aggrieved party may obtain a review of any final judgment of the district court by appeal to the appropriate circuit court of appeal. The appeal shall be taken as. in other civil cases.” La. R.S. 49:965. The court of appeal, in that instance, has appellate jurisdiction over the matter. See La. Const, art. V, § 10 A. The scope of the court of appeal’s review is defined by the same sections of the APA as those for the district court, the first court of appellate review. Davis, supra (citing La. Const, art. V, § 10(B); La. R.S. 49:964 G).
As noted at the outset, this case presents two issues — prescription and the treatment of the LIHTC. We separately address each issue.
ISSUE 1 — PRESCRIPTION
The prescription issue in this case is a legal issue subject to de novo review. Williams, 16-0015 at p. 4, 195 So.3d at 1227. Judicial review of the LTC’s decisions is governed by La. R.S. 47:1998, which provides that the applicable time period for filing an appeal is “thirty days of the entry of any final decision of the Louisiana Tax Commission.” La. R.S. 47:1998 A(l)(a) (emphasis added). Construing the statute as providing for a thirty-day period commencing on the date the LTC’s decision is signed, the trial court found that two of the Assessor’s four 11 tappeals were untimely filed and thus prescribed. After the trial court rendered its decision, this court held in the Williams case that “the entry of judgment is the date of mailing of a copy of the written decision of the Tax Commission.” 16-0015 at p. 10, 195 So.3d at 1230; see also Halliburton Energy Services, Inc. v. Bossier Par. Bd. of Review, 50,734, 50,735 (La.App. 2 Cir. 8/10/16), 200 So.3d 385, 388, 2016 WL 4198203, p. *3 (holding that “the statutory time delay begins to run on the date the Commission’s decision is mailed.”).
Given that each of the Assessor’s appeals in this case was filed within thirty days of the date of the LTC’s mailing of its judgment, all of the Assessor’s appeals were timely filed. We thus reverse the trial court’s decision granting the exception of prescription as to two of the appeals. Because the trial court never reached the merits of those two appeals, we remand those two appeals to the trial court for reconsideration on the merits in light of this court’s decision in this matter.[13]
ISSUE 2 — THE TREATMENT OF THE LIHTC
Unlike the prescription issue, -the issue presented regarding the treatment of the LIHTC is not a pure question of law; rather, it is a mixed question of law and fact. As The Muses point out, the Assessor *566 attempts to portray the LIHTC as a pure question of law, subject to de novo review,[14] but then asks the court to apply professional appraisal guidelines based on conflicting expert opinions and to judge |12the credibility of witnesses who testified before the LTC. The standard of review applicable here is thus, as The Muses contend, that this court must “give deference to agency determinations of questions of law and mixed questions of law and fact which' the agency has been charged to answer,” Davis, 13-0514 at p. 6, 131 So.3d at 395. Because the fundamental issue in this case is the proper treatment of the LIHTC for purposes of Louisiana ad valo-rem taxes, we- begin by setting forth a brief overview of the following: (i) the LIHTC program and (ii) Louisiana ad va-lorem tax principles.
Overview of the LIHTC program
As part of the Tax Reform Act of 1986, Congress created the federal LIHTC program. 26 U.S.C. § 42.- The purpose of the LIHTC program is “to encourage the private sector to develop affordable rental housing.” Holly Ridge Ltd. P’ship v. Pritchett, 936 So.2d 694, 695 (Fla. Dist. Ct. App. 2006). The LIHTC program “provides federal tax credits tied to amounts invested in qualifying low-income housing projects, The credit is typically enjoyed by one or more entities that become passive investors in a low-income housing development after the developer has formed a limited partnership or .limited-liability company.” Woda Ivy Glen Ltd. P’ship v. Fayette Cty. Bd. of Revision, 121 Ohio St.3d 175, 179, 902 N.E.2d 984, 988 (2009) (citing Joseph Rosenblum, Assessing the Value of Affordability: Ad Valorem Taxation of Properties Participating in the Low Income Housing Tax Credit Program, 2 J. Marshall Law School Fair & Affordable Housing Commentary 32, 33 (2006) (developers “syndicate” the right to the tax credit to passive investors through limited-liability entities)). “Tax credits equate to a dollar-for-dollar reduction of the holder’s federal tax liability, which can be taken for up to ten years if the project satisfies governmental requirements each year.” Holly Ridge Ltd. P’ship, 936 So.2d at 695. The tax credits are awarded over a ten-year period, such that one-tenth of the total amount of the LIHTC is allotted , each year until the credit is fully exhausted. Id. at 696. Each state receives an annual allotment of LIHTCs based on its population, and, in each state, a particular agency administers the grant of entitlement to the credit. Id. at 695. In Louisiana, the LHC administers the LIHTC program.
Simply stated, the LIHTC program is essentially “a partnership among the federal government, state governments, and the private sector.” Adam McNeely, Improving Low Income Housing: Eliminating the Conflict Between Property Taxes and the LIHTC Program, 15-SUM J. Affordable Housing & Community Dev. L., 324, 325 (2006), The mechanics of this partnership are best explained by outlining the steps of how the LIHTC program operates, which are as follows:
• [Step one:] the Internal Revenue Service (IRS) issues tax credits to state housing agencies .....
*567 • [Step two:] the state housing agencies award the tax credits to developers of low income housing projects based on proposals submitted by the developers seeking tax credits. ...
• [Step three: the developer, after receiving an allocation of tax credits,] sells the tax' credits to investors in return for capital to fund the project, ...[15]
• [Step four: the developer, after completing the project, operates] the project in compliance with requirements imposed by Congress in return for an award of tax credits.
Id. at 325.
The compliance requirements for" the LIHTC program include that a developer “restrict a certain percentage of its developed units to affordable-housing 114rates set by HUD through recorded land-use restrictions.” Scott B, Cohen, Patrick A. Clisham, A Primer on the Valuation of Affordable Housing in Chapter 11, 32-MAY Am. Bankr. Inst. J. 52, 52 (2013). “LIHTCs typically accrue and may be claimed on an annual basis for a period of 10 years following the completion of the development. The applicable affordable-housing restrictions typically remain in place for 30 years.” Id. The affordable-housing restrictions are set forth in a LURA. “The LURA is recorded in the public records to insure compliance. The developer must submit annual compliance reports and projects are audited every year to enforce compliance. Tax credits may be disallowed or recaptured if a project is out of compliance.” Holly Ridge, 936 So.2d at 696.
Louisiana ad valorem tax principles
The Louisiana Constitution charges each assessor with the responsibility of determining the fair market value of all property subject to taxation within his parish or district at intervals of not more than four years. La. Const, art. VII, § 18. The Louisiana Constitution exempts from ad valo-rem taxes “[a]ll incorporeal movables of any kind or nature whatsoever, except public service properties, bank stocks, and credit assessments on premiums written in Louisiana by insurance companies and loan and finance companies. For purposes of this Section, incorporeal movables shall have the meaning set forth in the Louisiana Civil Code of 1870, as amended.” La. Const, art. VII, § 21(18). See La. C.C. art. 473.[16]
h BUnder Louisiana law, property subject to ad valorem taxation is listed in the assessment roles at its assessed valuation, which is a percentage of its fair market value. La, Const, art. VII, § 18(A) (1974). The Louisiana Constitution mandates that “[f]air market value and use value of property shall be determined in accordance with criteria which shall be established by law and which shall ' apply uniformly throughout the state.” La. Const, art. VII, § 18 (D). Fair market value is defined by statute ás follows:
*568 Fair market value is the price for property which would be agreed upon between.a willing and informed buyer and a willing and informed seller under usual and ordinary circumstances; it shall be the highest price estimated in terms of money which property' will bring if exposed for sale on the open market with reasonable time allowed to find a purchaser who is buying with knowledge of all the uses and purposes to which the property is best adapted and for which it can be legally used.
La. R.S. 47:2321. Fair market value is to be determined by one or more of the following generally recognized appraisal procedures: the market approach, the cost approach, and or the income approach. La. R.S. 47:2323(C). Each of these approaches is defined in general terms in the statute. New Walnut Square Ltd. P’ship v. Louisiana Tax Comm’n, 626 So.2d 430, 431 (La. App. 4th Cir. 1993).[17]
| ifiThe current tax assessment dispute
The three parties — the Assessor, the taxpayers (the Muses), and the LTC — all agree that the proper approach to be employed in valuing the Complex is the income approach. Indeed, the LAC provides that “in assessing affordable rental housing, the income approach is recommended.” LAC § 61.V.303(C). Before the LTC, all three parties submitted appraisals using the income approach. All three parties also agreed and submitted appraisals using the restricted rentals in calculating the value of the Complex.[18] The fundamental difference between the parties’ appraisals, as Mr. Hilbert pointed out, was that the Assessor’s appraisal included the value of the LIHTC as income; whereas, the LTC’s and The Muses’ appraisers excluded the LIHTC.
The fundamental question presented to the LTC was whether the LIHTC is income and thus could be included by the Assessor when assessing the fair market 117value of the Complex, an affordable housing project, using the income approach. The LTC answered that question in the negative and adopted the fair mar *569 ket value as determined by its in-house appraiser, Ms. Labat, for each of the three tax parcels for 2014 and for one of those parcels for 2015.[19] In so doing, one commissioner commented at the hearing that “for consistency — and it has been in the past — I feel that this commission does not feel like the tax credit should be included.” Another commissioner commented that “these are matters of philosophy and that translate philosophy into Congressional intent as to the role of the tax credits.”
Acting as the first court of appellate review, the trial court affirmed the LTC’s decision. In its-oral reasons for judgment, the trial court stated the following:
The testimony revealed that, although the income approach was used by all of the appraisers, there were conflicting opinions as to whether the tax credits should be included in the income approach to establish fair market value. Mr. Truax and Mr. Sandoz, the assessor’s appraisers, opined that the tax credits should be included as income, but acknowledged there was no uniform rule or consensus within the appraisal community to do so. In fact, Mr. Truax testified that, in appraisal literature, the consensus is 50/50. Ms. Labat and Mr. Hilbert, on the other hand, opined that tax credits should not be included and are not required under established appraisal guidelines.
After reviewing the applicable law, this Court found no specific or general rule of law establishing that tax credits should or should [not] be included in determining the fair market value using the income approach. Thus, the LTC’s ruling that the tax credits should not be included in the determination of the fair market value shows that it -found the testimony of Mr. Hilbert and Ms. La-bat — and Mr. Truax, for that matter — to be believable and convincing.
hsQuoting La. R.S. 49:964 G(6), the trial court noted that “due regard shall be given to the agency’s determination of credibility issues.” Continuing, the trial court noted that the LTC, in making its determination, reasoned that the tax credits are incorporeal movables, as defined by La. C.C. art. 473, and therefore exempt from ad valo-rem taxes under La. Const, art. VII, § 21 (18).[20] The trial court found that the LTC’s decision was “sufficiently supported by the law, the record before it, and based upon its credibility determination,” which the trial court found was due great deference.
No Louisiana appellate court has addressed the issue of the proper treatment of the LIHTC in assessing an affordable housing project for ad valorem tax purposes using the income approach. Several other jurisdictions have addressed this issue and held — in line with The Muses’ contention and the LTC’s decisions — that the restricted rent should be used without consideration of the LIHTC.[21] Other juris *570 dictions, however, have reached the opposite result. See Horan v. Kenai Peninsula Borough Bd. of Equalization, 247 P.3d 990, 994 (Alaska 2011) (noting that whether or not to apply tax credits in the valuation of real estate has not been a | ^unanimously accepted process in all states and summarizing the split among the out-of-state courts on the issue).
Resort to out-of-state cases addressing the issue of the treatment of the LIHTC is of limited value for three reasons. First, the courts in other jurisdictions that have addressed this issue have split. Horan, supra. Second, as another court has noted, these out-of-state decisions “might have limited value as precedent because they have often been decided on constitutional and statutory provisions incompatible with our own state’s provisions.” Town Square Ltd. P’ship, 704 N.W.2d at 900. Third, in response to judicial decisions on this issue, the legislatures in several states have enacted statutory provisions to address the treatment of the LIHTC for purpose of ad valorem taxation; thus, the holdings in the out-of-state cases may. have been changed by subsequent legislation.[22]
| anHere, we are presented with the converse situation. While the appeals in these cases involving The Muses’ Complex were pending, the Louisiana Legislature enacted legislation, effective January 1, 2017, mandating that an assessor not include the LIHTC in assessing the value of affordable housing properties. See 2016 La. Sess. *571 Law Serv. Act 182 (H.B. 610) (“Act 182”). Act 182 amended La. R.S. 47:2823 to address an assessor’s valuation of any affordable rental housing property. The amendment to La. R.S. 47:2823, which enacted a new section E, provides as follows:
E. When performing a valuation of any affordable rental housing property, the assessor shah not consider any of the following in determining fair market value:
(1) Income tax credits available to the property under Section 42 of the Internal Revenue Code. (2) Below-market interest rate on financing -obtained under the Home Investment Partnership Program under the Cranston-Gonzales National Affordable Housing Act, or the Federal Home Loan Bank Affordable Housing Program established pursuant to the Financial Institution Reform, Recovery, and Enforcement Act of 1989. (3) Any other federal, state, or similar program intended to provide or finance affordable rental housing to persons of low or moderate income and requiring restricted . occupancy and rental rates based on the income of the persons occupying such housing.
The Legislature expressly provided that the amendment shall be effective January 1, 2017; the- amendment thus does not apply to this tax dispute.
The Assessor contends that Act 182 changes the law and confirms the correct: ness of his legal position in this case. The Assessor contends that if Louisiana law was to the contrary, it would have been unnecessary for the [S1 Legislature to enact new legislation. The Muses, on the other hand, point out that, in enacting Act 182, “Louisiana joined numerous other states to reject the position urged by the Assessor through legislation.” The Muses further point out that the Legislature did not change the definition of “fair market value” and that the Assessor has read meaning into that term that the Legislature does not recognize. The LTC adopts The Muses’ position and refers this court to its own prior decision on this issue, In re: St, Bernard I, LLC, LTC Docket Nos. 11-22173-085-90 (12/4/12), which likewise involved an assessment that pre-dated the Legislature’s adoption of Act 182.
In its prior decision in St. Bernard the LTC rejected the Assessor’s argument that the value of the tax credits is part of the income generated by the LIHTC properties. In so doing, the LTC reasoned as follows:
This Commission has, over the last few years, done extensive research into the field of ad valorem taxation of these types of affordable housing developments. In the process' of adoption and promulgation of its Rule 303C, the Commission was provided substantial 'input from both assessors and representatives of the affordable housing industry. This Commission concluded that the income approach to value was the most appropriate, and therefore the recommended, methodology to use to reflect the fair market value of affordable housing developments. The inclusion of the value of the. tax credits as part of the income generated from the properties counters and curtails the apparent legislative intent providing for the financing of such housing and creating the tax credits to encourage the building thereof.
The • Commission also[1] notes that the affordable housing “projects”, which developments such as those in this case have, replaced, were exempt from ad valorem taxes. The effect of the use of the income approach effectively puts new taxable property on the tax rolls (the regular market-rented units) while leaving off of the rolls those units which effectively replaced the “projects.” The *572 tax credits themselves are an intangible ■benefit flowing to the investors in such ^developments, and are not considered income from the properties. With certain enumerated exceptions, intangible property is not subject to ad valorem taxation in Louisiana.
Two factors support the LTC’s decision that the LIHTC is not income and that the value of the LIHTC could not be included in the assessment. First, the LIHTC is an intangible benefit flowing to investors in affordable housing developments. The LIHTC is thus an incorporeal movable, as that term is defined in La. C.C. art. 473, which is exempt from ad valorem taxes under La. Const., art. VII, § 21(18). Second, imposing a property tax based on the value of the LIHTC runs counter to the congressional intent behind the LIHTC program of encouraging low income housing development.
Explaining the conflict between that congressional intent and imposing ad valo-rem taxes on the value of the LIHTC, a commentator states:
The purpose of the LIHTC is to increase the supply of quality low income housing. However, the imposition of property taxes on projects funded through the LIHTC directly contravenes this federal policy. Although the LIHTC increases the supply of low income housing, property taxes reduce the supply of low income housing. Similarly, although the LIHTC increases the quality of low income housing, property taxes decrease the quality of low income housing. Moreover, problems with the assessment of property taxes on projects funded through the LIHTC exacerbate the harmful effects that property taxes have on the LIHTC.
Adam McNeely, Improving Low Income Housing: Eliminating the Conflict Between Property Taxes and the LIHTC Program, 15-SUM J. Affordable Housing & Community Dev. L. 324, 330 (2006). We note, as The Muses point out, that the Assessor’s expert, Mr. Truax, acknowledged these policy considerations underlying the LIHTC program.
The gist of the Assessor’s argument is that the LTC’s decisions, adopting its in-house appraiser’s (Ms. Labat’s) valuation of the Complex, violates the Uniform | ^Standards of Professional Appraisal Practice (“USPAP”) and Louisiana law because its appraiser’s valuation is exclusive of all forms of income and benefits derived from the Complex — it excludes the value of the LIHTC. The Assessor also contends that the LTC usurped his role as assessor by making a policy decision regarding the treatment of the LIHTC.
In support of his position that the LTC’s decisions violate the USPAP, the Assessor cites Advisory'Opinion 14 from the Appraisal Standards Board. According to the Assessor, the USPAP requires that all interests, benefits, obligations, and rights inherent in ownership of immovable property be reflected in establishing its fair market value. The Assessor- contends that such obligations include the LURA rent restrictions and such benefits include the LIHTCs available as a tradeoff for the LURA rent restrictions. The Assessor contends that Advisory Opinion 14 thus requires the inclusion of tax credits as income under the USPAP absent express legislation to the contrary.
Advisory Opinion 14 includes the following section entitled “Property Rights Issues”:
• Subsidies and incentives that encourage ■ housing for low- and moderate-income households may create intangible property rights in addition to real property rights and may also create restrictions that modify real property rights. The appraiser should demon *573 strate the ability to discern the differences between 'the real and intangible property rights and value the various rights involved. Low-Income Housing Tax Credits (LIHTCs) are an example of an incentive that results in intangible property rights that are not real property but might be included in the appraisal.[23]
| ¾As The Muses contend, Advisory Opinion 14 neither mandates the inclusion of the LIHTC, nor suggests that the LIHTC constitutes income of the property.
On the topic of the proper treatment of the LIHTC in appraising affordable housing property using the income approach, the parties’ expert appraisers presented conflicting testimony at the LTC hearing. Mr. Hilbert, The Muses’ expert, testified that in this case the tax credits (LIHTCs) were sold, that the proceeds were used to pay off the construction loan, and that the issue to be determined was the “plain old market value of a tangible asset called real estate property.” Mr. Hilbert characterized the tax credits as “intangibles” and emphasized that what is being appraised is the tangible asset — the real property. He further explained that banks “will not lend on the annual value of the tax credit.” Mr. Hilbert explained that this was the reason he refused to consider the tax credits in his appraisal of the Complex. He pointed out that he did not know “a permanent lender in America that would lend on the tax credits.” He commented that “[i]f I am breaking USPAP by not including the tax credits, I don’t think I’d have a license from the State of Louisiana.”
Mr. Hilbert further testified that the congressional intent behind the LIHTC program was that the tax credits' should not be considered because it would run counter to the intent of the legislation for low income housing. On this point, he commented that “[p]eople will not come to the state of Louisiana and build these properties to take the homeless off the streets. They’re going to chase every one of these LIHTC people out of the state.”
Mr. Truax, the Assessor’s expert, testified that he disagreed with Mr. Hilbert’s opinion* regarding the exclusion of the tax credits; he opined that the tax credits should be included in the value of LIHTC properties such as the Complex. 12KHe explained that “[t]hese properties would be purchased by sophisticated, knowledgeable investors. And they routinely consider all the benefits, particularly something like tax credits, when they are investing in a property. That’s what market value would be.”
In support of his opinion that the tax credits should be included, Mr. Truax quoted language from the LURA that The Muses signed, which provides that “the covenants, reservations, and restrictions set forth herein shall be deemed covenants running with the land to the extent permitted by law and shall pass to and be binding upon the owner’s successors entitled to the project throughout the terms of this agreement.”[24] According to Mr. Truax, this lan *574 guage “confirms very clearly that the [tax] credits attach to the property and run with the land” and that it cannot realistically be argued that “you’re going to ignore them in valuation of that particular property.”
Nonetheless, Mr. Truax acknowledged the existence of “two schools of thought” across the appraisal community, the courts, and apparently tax commissions , as to whether or not the tax credits should be included. Mr. Truax testified that “if you read the appraisal literature, you’ll find it’s about 50/50 as to how they [appraisers] approach it. ... It’s an issue that appraisers fall on both sides of the ledger.”
In his report, Mr. Truax summarized the logic on which his opinion that the tax credits should be included as follows:
The critical terms in the assessors[’] statutory obligation [to estimate the fair market value of an owner’s real property interests] ... |2iiwould dictate that tax credits be considered in the valuation of LIHTC projects for assessment purposes, based upon ,the. following logic:
If real property encompasses all “interests, benefits and rights inherent in the ownership of real estate,” clearly including the LURA obligations and tax credits associated with a LIHTC project development, and ownership is unified and vested in a LLC, then all property interest should be considered in total; if the obligations imposed by the LURA are given credibility, but the tax credits are ignored, then only a partial interest (arguably the general partner’s) in the property is being valued.
Further, LIHTC project developers/owners/investors are typically sophisticated and well informed, and their motivation to develop and/or invest in LIHTC projects is compatible with the underlying precepts of the “fair market value” definition; if a LIHTC project valuation is conducted with acceptance of the LURA obligations, but ignores the tax credit benefits,. the value that results in such an analysis of this segregated/partial interest is typically but a fraction of project development costs and even equity contributions, which is wholly illogical given the typical developer/investor profile and motivation — such would not present a proper “fair market value” estimate for the real property consistent with the principals [sic] of same’s definition.
Mr. Truax further stated that, “[a]s a corollary to this position, it is judged essential that assessors recognize the unusual economic characteristics of LIHTC projects and the resultant need to significantly reduce their assessed value in each of the first ten years after development to recognize the property value impact associated with the reduction in available/future tax credits; care should be taken to avoid improper assessment/valuation for LIHTC projects over time as a consequent of typical assessment process constraints.” See J. William Callison, The Effect of Tax Credit Restrictions on Valuation for Real Property Tax Purposes, 5 J. Affordable Housing & Community Dev. L. 32, 34, n. 16 (1995) (noting that “the amount and value of unused credits will decline throughout the ten-year credit period. Computation of the value of tax credit projects can be complex since value 127should increase as the remaining term of property use restrictions shortens, but should decrease as the amount of unused credits decreases.”).[25]
*575 Mr. Sandoz, the Assessor’s other expert, testified that the “USPAP requires that you do look at all the benefits that flow through the property in performing an income approach or any approach to value.” He explained that the Assessor’s office had a philosophical difference with the LTC relating to the treatment of the LIHTC. Contrary to the LTC, Mr. Sandoz testified that he believed the income approach should include the LIHTC in valuing such property.
The LTC, as the trial court noted, was thus presented with conflicting expert testimony on the issue of the proper treatment of the LIHTC- We, like the trial court, cannot conclude the LTC was mistaken in adopting the expert testimony that the LIHTC is not income and could not be included in the assessment of affordable housing property, such as the Complex, under the income approach.
Our conclusion is supported by an analysis of New Walnut Square Ltd. P’ship v. Louisiana Tax Comm’n, 626 So.2d 430 (La. App. 4th Cir. 1993). There, we held that a low-interest, federally subsidized mortgage could be considered as income for purposes of tax assessment under the income approach. Both the Assessor and The Muses cite New Walnut Square as supporting them position; the LTC contends that the Assessor’s reliance on New Walnut Square is misplaced.-
The Assessor contends that this court in the New Walnut Square case interpreted La. R.S. 47:2323, consistent with his position, as requiring the inclusion of all benefits of ownership when using the “income approach” to [¡^establish fair market value, According to the Assessor, the LIHTC falls into the same category as the mortgage in New Walrmt Square because it is a benefit of The Muses’ Complex, and it is transferred to any new property owner. The Assessor thus contends, as a matter of law, the LTC’s decisions to the contrary are erroneous.
The Muses counter that the New Walnut Square case — the only Louisiana case the Assessor cites — neither supports applying a de novo standard of review nor reversing the LTC’s decision. Rather, The Muses contend that the Neio Walnut Square case supports applying a deferential standard of review to the LTC’s decisions and affirming those decisions. The Muses emphasize that, in the context of ad valorem taxation, the LTC is charged with changing and correcting assessments and implementing generally recognized appraisal procedures. See La. R. S. 47:1990; La. R.S. 47:2323(C). The Muses point out that the LTC heard the expert appraisers’ testimony regarding generally accepted appraisal procedures, observed the Assessor’s attorney examine the experts, and questioned the experts itself. The Muses further emphasize that the LTC is authorized to establish procedures, rules, and regulations to implement these criteria and ensure they are applied uniformly throughout the State. La. R.S. 47:2323(A). After conducting “extensive research into the field of ad valorem taxation of these types of affordable housing developments,” the LTC promulgated Rule 303(C), which it has consistently interpreted to require the appraisal of affordable housing developments based on the income approach— without the addition of federal tax ^incentives. The Muses contend that these are issues on which the LTC is entitled to deference. The Muses thus contend that the LTC’s decisions should be affirmed.
*576 The LTC adopts The Muses’ position. The LTC adds that the fact the LIHTC is an incorporeal movable, exempt from ad valorem tax, is another distinction between this case and New Walnut Square, which involved the value of a mortgage — an incorporeal immovable not exempt from ad valorem taxes. Moreover, the LIHTC, the LTC notes, arises from the ownership of the limited partnership interests, which themselves are also incorporeal movables. The LTC thus contends that the Assessor’s reliance upon New Walnut Square is misplaced.
The issue this court addressed in the New Walnut Square case was whether it was proper to include the value of a low-interest, federally subsidized mortgage under Section 236 of the National Housing Act[26] as “income” under La. R.S. 47:2323 C(3)[27] in calculating the income approach to value an apartment complex for ad valo-rem taxes. The taxpayer argued on appeal that it was improper for the assessor to assign a separate value to the mortgage because it was not income. Rejecting the taxpayer’s argument, this court identified the following four factors that supported affirming the LTC’s decision in the assessor’s favor:
• The taxpayer failed to produce any expert testimony to counter or contradict the LTC’s appraiser’s expert testimony that the value of the low-interest mortgage is a proper factor to consider when using the income approach. New Walnut Square, 626 So.2d at 432.
hn* Absent a counter appraisal supporting the taxpayer’s argument, this court could not find the LTC erred in upholding the assessor’s original assessment. Id.
• “Certainly, the fact of lower mortgage payments decreases expenses and thereby increases the owner’s potential income from the investment.” Id.
• “[Bjecause the low interest mortgage is transferable, it may increase the resale value of the property,” Id.
Based on those four factors, this court affirmed the trial court’s decision upholding the LTC’s decision that the low-interest, federally subsidized mortgage was income and that the value of that mortgage could be included as income.
None of those four factors is present here. First, the LTC received reports from both parties acknowledging that market value should exclude “special or creative financing;” and it heard expert testimony from The Muses’ appraiser that tax credits are not typically considered in valuing affordable housing projects and are not required to be considered under established appraisal guidelines. Indeed, even one of the Assessor’s experts, Mr. Truax, acknowledged that there is no consensus within the appraisal community as to the inclusion of tax credits.
Second, the LTC received multiple appraisals valuing the property without inclusion of the LIHTC, including appraisals from its in-house appraiser, Ms. Labat, and The Muses’ appraiser, Mr. Hilbert.
*577 Third, the assumed basis for including the value of the low-interest, federally subsidized mortgage as income — that it decreases expenses and thereby increases net income — does not apply to the LIHTC. The LIHTC does not increase the actual net operating income of an affordable housing property, such as the Complex. As The Muses point out, the value of the LIHTC is derived from it decreasing the independent tax obligations of its recipient. Stated otherwise, the |s1financial impact of the LIHTC is to offset the independent federal tax liability of the investor-recipient who purchased the securities issued by The Muses.
Fourth, a LIHTC property, unlike a low-interest mortgage property, is subject to both practical and legal restrictions upon its transferability. Because of such restrictions, “LIHTC properties rarely sell, especially during the first 10 years of the project.” Kenneth N. Alford & David C. Wellsandt, Appraising Low-Income Housing Tax Credit Real Estate, 10/1/10 APPRAISAL J. 350, 356 (Oct. 1, 2010).[28] As the Muses point out, the Assessor’s expert, Mr. Truax, testified that affordable housing properties “almost never sell. And all the literature will tell you that.”
In sum, we find the Assessor’s reliance on Neto Walnut Square misplaced. Indeed, as The Muses contend, New Walnut Square, when analyzed in terms of the appropriate, deferential standard of review, dictates that we affirm the LTC’s decisions before us. Agreeing with the trial court, we find that the LTC’s decisions in the two appeals before us were “sufficiently supported by the law, the record before it, and based upon its credibility determination,” which were due great deference. We thus affirm the trial court’s finding that the LTC did not err in determining the LIHTC is not income and that the Assessor could not include the the LIHTC in assessing the Complex using the income approach.
DECREE
132For the foregoing reasons, the judgment of the trial court affirming the LTC’s decision in two of the Assessor’s appeals— 1800 Baronne Street (Tax No. 412106418 for the 2014 tax year); and 1740 Baronne St. (Tax No. 101107501 for the 2014 tax year) — is affirmed. The judgment of the trial court granting the exception of prescription as to the other two of the Assessor’s appeals — 1700 Baronne St. (Tax No. 101107401 for the 2014 tax year) and 1800 Baronne St. (Tax No. 412106418 for the 2015 tax year) — is reversed; those two appeals are remanded to the trial court with instructions to reconsider those two appeals on the merits in light of this court’s decision in this matter.
REVERSED IN PART; AFFIRMED IN PART; AND REMANDED WITH INSTRUCTIONS
BONIN, J., DISSENTS IN PART WITH REASONS.

. Although two phases (or buildings) comprise the Complex, three tax parcels comprise the Complex for tax assessment purposes. The tax parcels are identified by tax numbers. Phase I is divided into two tax parcels— 101107501 (1740 Baronne Street), and 412106418 (1800 Baronne Street); Phase II is a single tax parcel — 101107401 (1700 Bar-onne Street).

. The LTC decided the appeals as to all three panels for the 2014 tax year and as one of those same parcels for the 2015 tax year. The one 2015 tax-year appeal that the LTC decided pertained to 1800 Baronne St. (Tax No. 413206418). The LTC also heard corresponding appeals as to the other two parcels for the 2015 tax year, but it had not issued its decision when the Assessor filed his petitions for review in the trial court; therefore, those other two rulings were not before the trial court and are not before this court.

. An overview of the LIHTC program is provided elsewhere in this opinion.

. The Complex's amenities include gated entrances, controlled building access, a business center, a state-of-the-art fitness center, an entertainment/media room, two playgrounds, picnic and grilling areas, covered bike racks, elevators, high speed internet access, 24-hour camera surveillance, 218 off-street parking spaces, above-average landscaping and asso *561 ciated site improvements, and each unit includes a stackable or full size washer and dryer. The Muses was the first Leadership in Energy and Design certified building in the State of Louisiana.

. Here, the LURA is an agreement between The Muses and the former Louisiana Housing Finance Agency (now the LHC) — entitled "Tax Credit Regulatory Agreement.” There is a separate agreement for each phase of the Complex.

. With regard to the LIHTC, the Assessor, in the reply brief he filed in the district court, set forth the following undisputed facts:
• The Taxpayers, owners of the "The Muses Apartments” consisting of two (2) separate apartment building (the "Properties"), are "pass-through tax entities.”
• Low Income Housing Tax Credits afforded by the Louisiana Housing Authority and meeting the requirements of Internal Revenue Code § 42 were awarded to the Taxpayers as the owners of the Properties.
• The Low Income Housing Tax Credits are based on the construction costs of the Properties.
• Low Income Housing Tax Credits in the total amount of $15,323,560.00 ($1,532,-356.00 per year) were awarded and given to the Taxpayers.
• The Taxpayers chose to allocate all of the Low Income Housing Tax Credits to their equity investor in return for a $9,943,877.00 equity investment in the Taxpayers as a limited partner.
• The $15,323,560.00 in Low Income Housing Tax Credits plus tax depreciation from the Properties was a return on the equity investor's (limited partner's $9,943,877.00 investment as a limited partner in the Taxpayers),
• The equity investor (limited partner) can use either the Low Income Housing Tax Credits or cash to pay its Federal income tax liability-

. Ms, Labat likewise testified that the only difference between her appraisal and The Muses’ tax consultant’s (Mr. Hilbert’s) appraisal was that she utilized a different capitalization rate than him.

. Mr. Truax's testimony regarding appraisal theory is summarized elsewhere in this opinion.

.Mr. Sandoz accepted The Muses' net operating income figure and added to that the value of the LIHTC that was provided by The Muses to compute the income approach to value. Mr. Sandoz’s report attributes to the Complex a combined annual income of more than $2.65 million, determined as follows:

. Although we refer to the value for the Complex as a whole, the LTC’s decisions were broken down by tax parcel and by respective tax year,

. The trial court sustained the partial exception of prescription as to two of the appeals— those pertaining to 1700 Baronne St. (Tax No. 101107401 for 2014) and 1800 Baronne St. (Tax No. 412106418 for 2015). The trial court affirmed the LTC's decision as to the remaining two appeals — those pertaining to 1800 Baronne St. (Tax No. 412106418 for 2014) and 1740 Baronne St. (Tax No. 101107501 for 2014) — and provided that each party bear its own costs.

. La. R.S. 47:1998 A(l)(a) provides as follow:
Any taxpayer or bona fide representative of an affected tax — recipient body in the state dissatisfied with the final determination of the Louisiana Tax Commission under the provisions of R.S. 47:1989 shall have the right to institute suit within thirty days of the entry of any final decision of the Louisiana Tax Commission in the district
*564 court for the parish where the Louisiana Tax Commission is domiciled or the district court of the parish where the property is located contesting the correctness of assessment.

. Because of its ruling on the prescription issue, the trial court in this case only addressed the tax assessments as to 1800 Bar-onne Street (Tax No. 412106418 for 2014) and 1740 Baronne St. (Tax No. 101107501 at to 2014).

. On appeal, the Assessor frames tire issue regarding the treatment of the LIHTC as a question of law to be reviewed by this court de novo. He emphasizes that the LTC, as demonstrated by its brief to-this court, made two legal determinations here: “(i) low income housing tax credits are incorporeal movable property under the Louisiana Civil Code and consequently exempt from ad valo-rem taxation under the Louisiana Constitution; and (ii) as a ‘matter of public policy’ all elected assessors in Louisiana shall not include tax credits when valuing affordable housing.”

. "The tax credit sales proceeds' are used to minimize project debt and thereby enable the project to be economically feasible given the substantial and long-term restrictions placed on the developed property.” Holly Ridge Ltd. P'ship, 936 So.2d at 696.

. La. C.C. art. 473 defines incorporeal movables as follows:
Rights, obligations, and actions that apply to a movable thing are incorporeal movables. Movables of this kind are such as bonds, annuities, and interests or shares in entities possessing juridical personality.
Interests or shares in a juridical person that owns immovables are considered as movables as long as the entity exists; upon its dissolution, the right of each individual to a share in the immovables is an immovable.

. The criteria for determining fair market value are defined by La. R.S. 47:2323 as follows:
B. Each assessor shall follow the uniform guidelines, procedures, and rules and regulations in determining the fair market value of all property subject to taxation within his respective parish or district. Any manual or manuals used by an assessor shall be subject to approval by the Louisiana Tax Commission or its successor agency.
C. Criteria. The fair market value of real and personal property shall be determined by the following generally recognized appraisal procedures: the market approach, the cost approach, and/or the income approach.
(1) In utilizing the market approach, the assessor shall use an appraisal technique in which the market value estimate is predicated upon prices paid in actual market transactions and current listings.
(2) In utilizing the cost approach, the assessor shall use a method in which the value of a property is derived by estimating the replacement or reproduction cost of the improvements; deducting therefrom the . estimated depreciation; and then adding the market value of the land, if any.
(3)In utilizing the income approach, the assessor shall use an appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income.

. The Muses point out that the Assessor, in his brief to this court, includes a single sentence suggesting that if the LIHTC is not included, then the rental restriction should be disregarded. As The Muses point out, the Assessor failed to present any evidence to support such a valuation or to suggest that it is an appropriate method under generally recognized appraisal procedures. Moreover, the Assessor’s own appraisal used the restricted rent figures. We decline to reach that issue.

. Although the LTC rendered separate decisions as to each tax parcel and tax year, the fundamental issue in dispute is the same as to each of the three parcels and each of the two tax years. At the LTC hearing, Ms. Labat, the LTC’s appraiser, testified that "[i]t’s one property. They have multiple tax bills because it was built in multiple phases. But it’s just one properly.”

. The trial court apparently was referencing the LTC's reasoning in its prior decision in In re: St. Bernard I, LLC, LTC Docket Nos. 11-22173-085-90 (12/4/12), which the LTC incorporates by reference into its brief to this court. The LTC's prior decision is discussed elsewhere in this opinion.

.See Stillwater Housing Associates v. Rose, 254 P.3d 726, 729 (Okla. Civ. App. 2011) (holding that ”[t]he low income housing tax credit is a tax benefit that belongs to the investor rather than a right or privilege belonging to the land” and that the tax credit is *570 an intangible personal property exempt from taxes); Town Square Ltd. P'ship v. Clay County Bd. of Equalization, 704 N.W.2d 896, 901 (S.D. 2005) (citing. Cottonwood Affordable Housing v. Yavapai, 205 Ariz. 427, 72 P.3d 357 (Tax 2003) (tax credits are nontaxable intangibles); Greenfield Village Apartments, L.P. v. Ada County, 130 Idaho 207, 938 P.2d 1245 (1997) (property valuation should consider restrictions on rent; concurring opinion argues that valuation should also include benefits of the tax credits); Maryville Properties, L.P. v. Nelson, 83 S.W.3d 608 (Mo.Ct.App.2002) (restricted rents - must be taken into account, but tax credits cannot be considered); Cascade Court, L.P. v. Noble, 105 Wash. App. 563, 20 P.3d 997 (2001) (same); Metro. Holding v. Milwaukee Review Bd., 173 Wis.2d 626, 495 N.W.2d 314 (1993) (property assessment for low-income housing should be based on actual rents and expenses-not addressing tax credits)).

. As The Muses point out in their brief to this court, the following is a list of similar legislation regarding the treatment of the LIHTC that other states have adopted:
• Ga. Code Ann. § 48-5-2(3)(B.l) (“The tax assessor shall not consider any income tax credits ... in determining the fair market value of real property.”);
• Ind. Code § 6-1.1-4-40 ("The value of federal income tax credits awarded under Section 42 of the Internal Revenue Code may not be considered in determining the assessed value of low income housing tax credit property,”);
• Md. Code Ann., Tax — Property,. § 8-105(a)(3) ("the supervisor ... (ii) may not consider income tax credits under § 42 of the Internal Revenue Code as income attributable to the real property”);
• Neb. Rev. Stat. § 77-1333(8) (“Any low-income housing tax credits authorized un~ der section 42 of the Internal Revenue Code that were granted to owners of the project shall not be considered income for purposes of the calculation.”);
• N.H. Rev. Stat. Ann. § 75.T-a(VII) (“The assessed .valuation of residential rental property subject to a housing covenant under the low-income housing tax credit program shall not take into consideration the value of intangible assets including, but not limited to . ■.. tax credits where such subsidies are used to offset project development expenses in order to allow for restricted rents,”);
• 53 .Pa. Stat. and Cons. Stat. Ann. § 8842 (c)(2) ("Federal or State income tax credits . with respect to property shall not be considered real property or income attributable to real property.”);
• S.D. Codified Laws § 10-6-78 ("No county director of equalization may consider any federal income tax credit that is extended to the property owner... for the purpose of assessing any real property.”).

. Advisory Opinion 14 further states that: “Standards Rule l-2(e) allows the inclusion of intangible assets that are not real property in the appraisal. If they are significant to the overall value, the value of the intangibles should be developed and reported separately, as required by Standards Rule l-4(g).” Advisory Opinion 14 still further states that “[a] critical factor in all subsidized housing appraisals is the analysis of whether or not the various subsidies, incentives, and restrictions remain with the real property following a sale or foreclosure and thus are marketable property rights to be included in the appraisal.”

. As noted elsewhere in this opinion, The Muses entered into two such agreements. Each of those agreements was entitled the “Tax Credit Regulatory Agreement.” A sepa *574 rate agreement was entered into for each .phase of the development.

. The Muses contend that the Assessor’s assessments are inconsistent with Mr. Truax's opinion that the value of the LIHTC must be reflected to decrease over time. The inconsis *575 tency, according to the Muses, is evidenced by the fact the Assessor assesses the Complex at the same value for both the 2014 and 2015 tax years.

. The Section 236 program allowed the makers of the notes to obtain an extremely low rate of interest; in the New Walnut Square case, one percent. In exchange for the low interest subsidy, HUD regulated and restricted, among other things, rental rates. New Walnut Square, 626 So.2d at 431.

. LTC’s appraiser, in that case, testified that he used the income approach and that he arrived at the value of the apartment complex by adding the assigned value of the low interest mortgage to the value of the income stream.

. See 26 U.S.C. § 42(j) (governing recapture of tax credits); see also Maryville Properties, 83 S.W.3d at 616, n. 5 (noting that “if a subsequent purchase in year fourteen changed the use of the property, the tax credits would then be subject to recapture plus penalties, even though the beneficiary of the credit no longer had any interest in the property.”); Bayridge Assocs. LP v. Dept. of Rev., 321 Or. 21, 32, 892 P.2d 1002, 1007 (Or. 1995) (excluding LIHTC based on restrictions on sale stating, "the most probable price to be received for the properties at issue would not include the tax credits, because the record shows that the credits would be recaptured if the property were not maintained as low-income housing.”).

. I concur in the dispositions with respect to prescription.